**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| SANDY S. SMART, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| *versus* | § | CIVIL ACTION NO. H-04-4325 |
| | § | |
| JO ANNE B. BARNHART, Commissioner | § | |
| of the Social Security Administration, | § | |
| | § | |
| *Defendant.* | § | |

**MEMORANDUM AND ORDER**

Pending before the court are Plaintiff Sandy L. Smart ("Smart") and Defendant Jo Anne B.

Barnhart's, Commissioner of the Social Security Administration ("Commissioner"), cross-motions

for summary judgment. Smart appeals the determination of an Administrative Law Judge ("ALJ")

that she is not entitled to receive Title II disability insurance benefits or Title XVI supplemental

security income benefits. *See* 42 U.S.C. § 416(i), 423, 1382c(a)(3)(A). Having reviewed the pending

motions, the submissions of the parties, the pleadings, the administrative record, and the applicable

law, this Court is of the opinion that Smart's Motion for Summary Judgment (Docket Entry No. 13)

should be denied, the Commissioner's Motion for Summary Judgment (Docket Entry No. 14) should

be granted, and the Commissioner's decision denying benefits be affirmed.

**I.**   ***Background***

Smart filed an application for disability insurance benefits and supplemental security income

with the Social Security Administration on July 12, 2000, claiming that she had been disabled and

unable to work since June 21, 1998.  (R. 21, 122-125).[1]  Smart alleges that she suffers from a variety of disabling conditions, including a herniated disc, chronic pain in the neck and back, nerve damage in her back, shoulders, right arm and hands, and an affective mood disorder (depression).  (R. 33, 131).  After being denied benefits initially and on reconsideration (R. 75-89), Smart requested an administrative hearing before an ALJ.  (R. 90-93).

A hearing was held on June 27, 2002, in Corpus Christi, Texas, at which time the ALJ heard testimony from Smart, James Armstrong, M.D. ("Dr. Armstrong"), a medical expert, and Donna Johnson, a vocational expert ("VE").  (R. 30-74).  In a decision dated July 17, 2002, the ALJ denied Smart's application for benefits.  (R. 21-28).  On August 7, 2002, Smart appealed the ALJ's decision to the Appeals Council of the SSA's Office of Hearings and Appeals.  (R. 13-16).  After receiving and considering supplemental evidence (including additional medical records), the Appeals Council, on September 10, 2004, denied Smart's request to review the ALJ's determination.  (R. 5-9).  This rendered the ALJ's opinion the final decision of the Commissioner.  *See Sims v. Apfel*, 530 U.S. 103, 107 (2000).  Smart filed this case on November 12, 2004, seeking judicial review of the Commissioner's denial of her claim for benefits.  *See* Docket Entry No. 1.

---

[1]  The ALJ amended Smart's alleged onset date to June 29, 2000.  (R. 21, 27).  The ALJ explained that Smart had previously filed applications for disability insurance benefits and supplemental security income on October 30, 1998, with an onset date of June 21, 1998.  (R. 21).  After Smart's application was denied at the initial and reconsideration levels, she proceeded to a hearing before an ALJ, which resulted in a decision denying benefits on June 29, 2000.  (R. 21).  Smart appealed the ALJ's decision to the Appeals Council of the SSA's Office of Hearings and Appeals, which denied Smart's request to review the ALJ's decision on November 7, 2001.  (R. 21).  There was no evidence that Smart filed a complaint with the United States District Court; thus, the Appeals Council's order was considered the final action of the Commissioner.  As such, the ALJ in this hearing amended Smart's alleged onset date to June 29, 2000, which was the date the ALJ rendered his decision in her previous application.  (R. 21).

II.    *Analysis*

A.    *Statutory Bases for Benefits*

SSI benefits are authorized by Title XVI of the Act and are funded by general tax revenues. *See* SOCIAL SECURITY ADMINISTRATION, SOCIAL SECURITY HANDBOOK, § 2100 (14th ed. 2001). The SSI Program is a general public assistance measure providing an additional resource to the aged, blind, and disabled to assure that their income does not fall below the poverty line. *See* 20 C.F.R. § 416.110.  Eligibility for SSI is based upon proof of indigence and disability.  *See* 42 U.S.C. §§ 1382(a), 1382c(a)(3)(A)-(C).  A claimant applying to the SSI program cannot receive payment for any period of disability predating the month in which she applies for benefits, no matter how long she has actually been disabled.  *See Brown v. Apfel*, 192 F.3d 492, 495 n.1 (5th Cir. 1999); *see also* 20 C.F.R. § 416.335.  The applicable regulation provides:

> When you file an application in the month that you meet all the other requirements for eligibility, the earliest month for which we can pay you benefits is the month following the month you filed the application.  If you file an application after the month you first meet all the other requirements for eligibility, we cannot pay you for the month in which your application is filed or any months before that month.

20 C.F.R. § 416.335.  Thus, the month following an application, here, July 2000, fixes the earliest date from which benefits can be paid.  (R. 579-581).  Eligibility for SSI payments, however, is not dependent on insured status.  *See* 42 U.S.C. § 1382(a).

Social Security disability insurance benefits are authorized by Title II of the Act and are funded by Social Security taxes.  *See also* SOCIAL SECURITY ADMINISTRATION, SOCIAL SECURITY HANDBOOK, § 2100.  The disability insurance program provides income to individuals who are forced into involuntary, premature retirement, provided they are both *insured* and *disabled*, regardless of indigence.  A claimant for disability insurance can collect benefits for up to twelve

3

months of disability prior to the filing of an application. *See* 20 C.F.R. §§ 404.131, 404.315; *Ortego v. Weinberger*, 516 F. 2d 1005, 1007 n.1 (5th Cir. 1975); *see also Perkins v. Chater*, 107 F.3d 1290, 1295 (7th Cir. 1997). For purposes of Title II disability benefits, Smart was insured through the date of the ALJ's decision—July 17, 2002. (R. 14, 17). Consequently, to be eligible for disability benefits, Smart must prove that she was disabled prior to that date.

While these are separate and distinct programs, applicants seeking benefits under either statutory provision must prove "disability" within the meaning of the Act, which defines disability in virtually identical language for both programs. *See* 42 U.S.C. §§ 423(d), 1382c(a)(3), 1382c(a)(3)(G); 20 C.F.R. §§ 404.1505(a), 416.905(a). Under both provisions, disability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. *See* 42 U.S.C. §§ 423(d)(1)(A), 1382c(3)(A). Moreover, the law and regulations governing the determination of disability are the same for both disability insurance benefits and SSI. *See Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994), *cert. denied*, 514 U.S. 1120 (1995).

**B.**     ***Standard of Review***

**1.**     ***Summary Judgment***

The court may grant summary judgment under FED. R. CIV. P. 56(c) when the moving party is entitled to judgment as a matter of law because there is no genuine issue as to any material fact. The burden of proof, however, rests with the movant to show that there is no evidence to support the nonmoving party's case. If a reasonable jury could return a verdict for the nonmoving party, then

a motion for summary judgment cannot be granted because there exists a genuine issue of fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

An issue of fact is "material" only if its resolution could affect the outcome of the case. *See Duplantis v. Shell Offshore, Inc.*, 948 F.2d 187, 189 (5th Cir. 1991). When deciding whether to grant a motion for summary judgment, the court shall draw all justifiable inferences in favor of the nonmoving party, and deny the motion if there is some evidence to support the nonmoving party's position. *See McAllister v. Resolution Trust Corp.*, 201 F.3d 570, 574 (5th Cir. 2000). If there are no issues of material fact, the court shall review any questions of law *de novo*. *See Merritt-Campbell, Inc. v. RxP Prods., Inc.*, 164 F.3d 957, 961 (5th Cir. 1999). Once the movant properly supports the motion, the burden shifts to the nonmoving party, who must present specific and supported material facts, of significant probative value, to preclude summary judgment. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *International Ass'n of Machinists & Aerospace Workers, AFL-CIO v. Compania Mexicana de Aviacion, S.A. de C.V.*, 199 F.3d 796, 798 (5th Cir. 2000).

### 2.    *Administrative Determination*

Judicial review of the Commissioner's denial of disability benefits is limited to whether the final decision is supported by substantial evidence on the record as a whole and whether the proper legal standards were applied to evaluate the evidence. *See Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir. 2002). "Substantial evidence" means that the evidence must be enough to allow a reasonable mind to support the Commissioner's decision; it must be more than a mere scintilla and less than a preponderance. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Masterson*, 309 F.3d at 272; *Brown*, 192 F.3d at 496.

5

When applying the substantial evidence standard on review, the court "scrutinize[s] the record to determine whether such evidence is present." *Myers v. Apfel*, 238 F.3d 617, 619 (5th Cir. 2001) (citations omitted). If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed. *See Watson v. Barnhart*, 288 F.3d 212, 215 (5th Cir. 2002). Alternatively, a finding of no substantial evidence is appropriate if no credible evidentiary choices or medical findings support the decision. *See Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001). The court may not, however, reweigh the evidence, try the issues *de novo*, or substitute its judgment for that of the Commissioner. *See Masterson*, 309 F.3d at 272. In short, "[c]onflicts in the evidence are for the Commissioner and not the courts to resolve." *Id.*

C.    ***ALJ's Determination***

An ALJ must engage in a five-step sequential inquiry to determine whether the claimant is capable of performing "substantial gainful activity," or is, in fact, disabled:

1.    An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of the medical findings. *See* 20 C.F.R. §§ 404.1520(b), 416.920(b).

2.    An individual who does not have a "severe impairment" will not be found to be disabled. *See* 20 C.F.R. §§ 404.1520(c), 416.920(c).

3.    An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors. *See* 20 C.F.R. §§ 404.1520(d), 416.920(d).

4.    If an individual is capable of performing the work she has done in the past, a finding of "not disabled" must be made. *See* 20 C.F.R. §§ 404.1520(e), 416.920(e).

5.    If an individual's impairment precludes performance of her past work, then other factors, including age, education, past work experience, and residual functional capacity must be considered to determine if any work can be performed. *See* 20 C.F.R. §§ 404.1520(f), 416.920(f).

*Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000); *accord Boyd*, 239 F.3d at 704-05.  The claimant has the burden to prove disability under the first four steps.  *See Myers*, 238 F.3d at 619.  If the claimant successfully carries this burden, the burden shifts to the Commissioner in step five to show that other substantial gainful employment is available in the national economy, which the claimant is capable of performing.  *See Masterson*, 309 F.3d at 272; *Greenspan*, 38 F.3d at 236.  If the Commissioner is able to verify that other work exists in significant numbers in the national economy that the claimant can perform in spite of her existing impairments, the burden shifts back to the claimant to prove that she cannot, in fact, perform the alternate work suggested.  *See Boyd*, 239 F.3d at 705.  A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis.  *See id.*

The mere presence of an impairment does not necessarily establish a disability.  *See Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992).  An individual claiming disability benefits under the Act has the burden to prove that she suffers from a disability as defined by the Act.  *See Newton*, 209 F.3d at 452; *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990); *Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988); *Cook v. Heckler*, 750 F.2d 391, 393 (5th Cir. 1985).  A claimant is deemed disabled under the Act only if she demonstrates an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  *Shave v. Apfel*, 238 F.3d 592, 594 (5th Cir. 2001); *accord Newton*, 209 F.3d at 452; *Crowley v. Apfel*, 197 F.3d 194, 197-98 (5th Cir. 1999); *Selders*, 914 F.2d at 618; *see also* 42 U.S.C. § 423(d)(1)(A).  "Substantial gainful activity" is defined as work activity involving

7

significant physical or mental abilities for pay or profit. *See Newton*, 209 F.3d at 452-53; *see also* 20 C.F.R. §§ 404.1572(a)-(b), 416.972.

A medically determinable "physical or mental impairment" is an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. *See Hames v. Heckler*, 707 F.2d 162, 165 (5th Cir. 1983); *see also* 42 U.S.C. § 423(d)(3). "[A]n individual is 'under a disability, only if his impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .'" *Greenspan*, 38 F.3d at 236 (quoting 42 U.S.C. § 423(d)(2)(A)). This is true regardless of whether such work exists in the immediate area in which the claimant resides, whether a specific job vacancy exists, or whether the claimant would be hired if she applied. *See Oldham v. Schweiker*, 660 F.2d 1078, 1083 (5th Cir. 1981); *see also* 42 U.S.C. § 423(d)(2)(A). In the case at bar, when addressing the first four steps, the ALJ determined:

1. The claimant met the disability insured status requirements of the Act on June 29, 2000 (the amended alleged onset date), the date the claimant has not worked and continues to meet them through the date of this Decision.

2. The claimant has not engaged in substantial gainful activity since June 21, 1998.

3. the medical evidence establishes that the claimant has severe hypertension, arthritis and chronic back pain, but that she does not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4.

4. The evidence of record does not support the claimant's allegations of impairments, including pain, of such severity as to be disabling under the regulations for determining disability.

5.    The claimant has the residual functional capacity to perform work-related activities except for work:  the limitations would be that the claimant can occasionally lift and/or carry (including upward pulling) 10 pounds, she can frequently lift or carry (including upward pulling) 10 pounds, stand, walk or sit (with normal breaks) about six hours in an 8-hour workday; and postural limitations that the claimant can occasionally climb ramps, stairs and never climb ladders/ropes and scaffolds; environmental limitations that she avoid all exposure in around hazards (machinery, heights) (20 C.F.R. §§ 404.1545 and 416.945).

6.    The claimant's past relevant work as a payroll manager, and accounts payable clerk and as a billing specialist did not require the performance of work-related activities precluded by the above limitation(s) (20 C.F.R. §§ 404.1565 and 416.965).

7.    The claimant's impairments do not prevent the claimant from performing her past relevant work.

8.    The claimant was not under a "disability" as defined in the Social Security Act, at any time through the date of the decision (20 C.F.R. §§ 404.1520(e) and 416.920(e)).

(R. 27-28).  Because the ALJ found that Smart could perform her past relevant work, the ALJ did not proceed to step five of the sequential evaluation process.

This Court's inquiry is limited to a determination of whether there is substantial evidence in the record to support the ALJ's findings and whether the proper legal standards have been applied. See Masterson, 309 F.3d at 272; Watson, 288 F.3d at 215; Myers, 238 F.3d at 619; Newton, 209 F.3d at 452; Greenspan, 38 F.3d at 236; see also 42 U.S.C. §§ 405(g), 1383(c)(3).  To determine whether the decision to deny Smart's claim for disability benefits is supported by substantial evidence, the court weighs the following four factors: (1) the objective medical facts; (2) the diagnoses and opinions from treating and examining physicians; (3) the claimant's subjective evidence of pain and disability, and any corroboration by family and neighbors; and (4) the claimant's age, educational background, and work history.  See Martinez v. Chater, 64 F.3d 172, 174 (5th Cir. 1995); Wren v.

9

*Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991) (citing *DePaepe v. Richardson*, 464 F.2d 92, 94 (5th Cir. 1972)).  Any conflicts in the evidence are to be resolved by the ALJ and not the court.  *See Newton*, 209 F.3d at 452; *Brown*, 192 F.3d at 496; *Martinez*, 64 F.3d at 174; *Selders*, 914 F.2d at 617.

    **D.**    ***Issues Presented***

Smart contends that the decision of the ALJ is not supported by substantial evidence. Specifically, Smart claims that the ALJ erred by:  (1) giving controlling weight to non-examining physicians' opinions; (2) failing to develop a full and fair record; and (3) improperly assessing Smart's residual functional capacity.  *See* Docket Entry No. 13.  The Commissioner disagrees with Smart's contentions, maintaining that the ALJ's decision is supported by substantial evidence.  *See* Docket Entry No. 15.

    **E.**    ***Review of ALJ's Decision***

        **1.**    ***Objective Medical Evidence and Opinions of Physicians***

When assessing a claim for disability benefits, "[i]n the third step, the medical evidence of the claimant's impairment is compared to a list of impairments presumed severe enough to preclude any gainful work."  *Sullivan v. Zebley*, 493 U.S. 521, 525 (1990).  If the claimant is not actually working and her impairments match or are equivalent to one of the listed impairments, she is presumed to be disabled and qualifies for benefits without further inquiry.  *See id.* at 532; *see also* 20 C.F.R. § 416.920(d).  When a claimant has multiple impairments, the Act requires the Commissioner to "consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity."  42 U.S.C. § 423(d)(2)(B); *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000).  The relevant regulations similarly provide:

> In determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity.   If we do find a medically severe combination of impairments, the combined impact of the impairments will be considered throughout the disability determination process.   If we do not find that you have a medically severe combination of impairments, we will determine that you are not disabled.

20 C.F.R. §§ 404.1523, 416.923; *see also Loza*, 219 F.3d at 393.   The medical findings of the combined impairments are compared to the listed impairment most similar to the claimant's most severe impairment.  *See Zebley*, 493 U.S. at 531.

The claimant has the burden to prove at step three that her impairment or combination of impairments is equivalent to or greater than a listed impairment.  *See id.* at 530-31; *Selders*, 914 F.2d at 619.   The listings describe a variety of physical and mental illnesses and abnormalities, and are typically categorized by the body system they affect.  *See Zebley*, 493 U.S. at 529-30.   Individual impairments are defined in terms of several specific medical signs, symptoms, or laboratory test results.  *See id.* at 530.   For a claimant to demonstrate that her disorder matches an Appendix 1 listing, it must meet *all* of the specified medical criteria.  *See id.*   An impairment, no matter how severe, does not qualify if that impairment manifests only some of the specified criteria.  *See id.*

For a claimant to qualify for benefits by showing that her unlisted impairment, or combination of impairments, is equivalent to a listed impairment, she must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment.  *See id.* at 531 (citing 20 C.F.R. § 416.926(a)).   A claimant's disability is equivalent to a listed impairment if the medical findings are at least equal in severity and duration to the listed findings.  *See* 20 C.F.R. §§ 404.1526(a), 416.926(a).   The applicable regulations further provide:

(1)(i)   If you have an impairment that is described in the Listing of Impairments in Appendix 1 of Subpart P of this chapter, but—

    (A)   You do not exhibit one or more of the medical findings specified in the particular listing, or

    (B)   You exhibit all of the medical findings, but one or more of the findings is not as severe as specified in the listing;

(ii)   We will nevertheless find that your impairment is medically equivalent to that listing if you have other medical findings related to your impairment that are at least of equal medical significance.

20 C.F.R. §§ 404.1526(a), 416.926(a).  Nonetheless, "[a] claimant cannot qualify for benefits under the 'equivalence' step by showing that the overall functional impact of his unlisted impairment or combination of impairments is as severe as that of a listed impairment."  *Zebley*, 493 U.S. at 531. Ultimately, the question of equivalence is an issue reserved for the Commissioner.  *See Spellman v. Shalala*, 1 F.3d 357 (5th Cir. 1993); 20 C.F.R. §§ 404.1527(e), 416.927(e).

A review of the medical records submitted in connection with Smart's administrative hearing reveals that on June 21, 1998, Smart was admitted to the emergency room at St. Elizabeth Hospital in Beaumont, Texas, after being involved in a car accident.  (R. 258-265).  Smart reported pain in her back and neck.  (R. 260).  She was discharged that same day home with a pain medication prescription.  (R. 260).  An MRI scan taken in June 1998 reportedly revealed disc herniation of C-6 with some impingement/compression of the spinal cord.  (R. 252).

In March 1999, Smart reportedly was involved in a second car accident.  (R.252).  Smart was referred to Munawwer Khurshid, M.D. ("Dr. Khurshid") for treatment of neck and back pain. (R. 252-253).  In August 1999, Dr. Khurshid observed that Smart's extremities were without cyanosis, clubbing, or edema, and that her coordination and gait were normal.  (R. 253).

12

Dr. Khurshid's assessment was that Smart had a "[m]ildly abnormal neurological examination suggestive of radiculopathy." (R. 253). An MRI of Smart's cervical spine taken on August 24, 1999, revealed mild spondylitic changes at multiple levels throughout her cervical spine. (R. 245, 254-255). There was some congenital spinal stenosis and some acquired canal stenosis that was mild at all cervical levels. (R. 245, 254-255). It was noted to be worse at C-5/6. (R. 245, 254). There was no spinal cord compression. (R. 245, 254-255). The neural foramina were open. (R. 245, 254-255).

On the referral of Dr. Khurshid, on September 22, 1999, Stig E. Peitersen, M.D. ("Dr. Peitersen"), a neurological surgeon, met with Smart for evaluation of her neck and arm complaints. (R. 243-247). After reviewing MRI scans, Dr. Peitersen reported that he "did not find any convincing evidence of any significant cervical radiculopathy or myelopathy." (R. 243). He further observed that she did not have any peripheral nerve entrapment of the upper extremities. (R. 243). Dr. Peitersen's assessment was as follows: neck pain of uncertain etiology; no clear cut evidence of a significant cervical radiculopathy; no significant evidence of a significant peripheral nerve entrapment of the upper extremities; mild cervical spondylosis; and mild congenital cervical spinal canal stenosis. (R. 245). Dr. Peitersen did not recommend any surgical intervention; instead, he recommended continued conservative care possibly in the form of work hardening versus pain management program. (R. 243, 246).

On September 30, 1999, Dr. Khurshid noted Smart's complaints of muscle spasms and pain in her neck. (R. 242, 248). On examination, Dr. Khurshid found that Smart had normal strength bilaterally and her coordination and gait examinations shown no trunkal ataxia. (R. 248). Dr.

Khurshid adjusted Smart's medication and began her on physical and occupational therapy.  (R. 248-249).

In October 1999, Smart presented at Jasper Memorial Hospital complaining of irregular vaginal bleeding and pelvic pain.  (R. 208).  Due to a variety of conditions (*e.g.*, menometrorrhagia, uterine fibroids, and endometriosis), she was scheduled for a hysterectomy.  (R. 209-213).

On November 30, 1999, Dr. Khurshid completed a "medical source statement" for Smart, noting diagnoses of degenerative joint disease of the spine and carpal tunnel syndrome.  (R. 237-238).  In completing the questionnaire, Dr. Khurshid's responses indicated that Smart could sit for a maximum of 2 hours at a time for a total of five hours; Smart did not require leg elevation; she did not require frequently alternate sitting with standing with lying; and, she did not require an assistive device for ambulating.  (R. 237-238).  Dr. Khurshid opined that she could stand continuously for 30 minutes at a time before alternating positions.  (R. 238).  He further found that Smart could lift and carry up to 2 pounds for 2-3 hours per workday, and she was able to repeatedly handle and finger objects with both hands.  (R. 238).  He also concluded that Smart was able to stoop, "but limited." (R. 238).

On the referral of Dr. Khurshid, on February 29, 2000, Smart participated in a "functional capacity evaluation" at the Lufkin Sport & Rehabilitation Center.  (R. 220).  Her former job duties as a clerical secretary were assessed.  (R. 221).  Her aerobic condition was noted as "excellent," scoring in the 90th percentile.  (R. 224).  Her reported pain level during the aerobic test increased from a "3" to a "4" on a scale of 10.  (R. 224).   According to the testing, Smart would be able to meet the demands of 80% of the tasks of a clerical secretary including standing, walking, twisting, and she would be unable to meet demands in 20% of the tasks including sitting (hours).  (R. 225). Inconsistency was noted during the static strength tests, which indicated inaccurate data was

produced by Smart.  (R. 226).  Smart was screened for symptom magnification which revealed that Smart exhibited inappropriate responses in 7 of 14 tests (50%), demonstrating a moderate amount of inconsistent effort occurred.  (R. 228, 234).  The summary of the this evaluation is largely illegible (R. 232-234); however, it appears that therapy was recommended.  (R. 234).

In April 2000, Smart visited Sudheer Kaza, M.D. ("Dr. Kaza"), complaining of depression.  (R. 217).  In a progress note, Dr. Kaza diagnosed her with depression and post traumatic stress disorder, prescribed medication, and recommended she return in one month.  (R. 217).  In a progress note dated May 26, 2000, Smart acknowledged doing better with medication.  (R. 216).  It was recommended that Smart return in one month.  (R. 217).

On August 14, 2000, Dr. Khurshid met with Smart to discuss her back and neck pain.  (R. 218).  Dr. Khurshid reviewed with Smart "in detail" the results from her functional capacity evaluation conducted in February 2000.  (R. 218).  Dr. Khurshid opined that Smart needed chronic pain management and a reassessment of her functional status.  (R. 218).

In September 2000, Smart returned to Dr. Kaza, claiming she was depressed but did not have money to see the doctor regularly or to buy the medication.  (R. 215).  Dr. Kaza recommended that Smart return in two months for a follow-up appointment.  (R. 215).

On October 17, 2000, Dr. Khurshid wrote a letter certifying that Smart suffers from cervical spondylosis and degenerative disc disease in her lumbrosacral area; that she has chronic pain that gets exacerbated when she stands, sits, or walks for some period of time; and that she was being treated with medication with some improvement, but not in full control.  (R. 214).

On November 28, 2000, Smart underwent a consultative internal medicine examination with Osama B. Nahas, M.D. ("Dr. Nahas").  (R. 204-207).  At that time, Smart complained of recurrent

15

cervical pain radiating to the right shoulder and right extremity as well as down to the right hand. (R. 204).  Upon physical examination, Dr. Nahas observed that Smart did not appear to be in distress. (R. 205).  Her lungs were clear; her heart was regular. (R. 205).  She had no edema in her extremities. (R. 205).  Dr. Nahas reported tenderness in the cervical region and in the lower back, with mild guarding of the bilateral trapezius muscles. (R. 205).  There was no evidence of inflammation, effusion, or swelling in any of the joints tested. (R. 205).  Smart was alert and oriented with normal speech. (R. 205).  Her reflexes also were normal. (R. 205).  Smart was able to perform supine straight leg raising up to 70 degrees bilaterally and sitting straight leg raising up to 90 degrees. (R. 205).  Her muscle strength was 4/5 in the left lower extremity and 5/5 in other muscle groups. (R. 205).  There was no evidence of muscle wasting, atrophy, or fasciculation. (R. 205).  Smart's  right handgrip was 4/5; her left handgrip was 5/5, and her fine finger movements were normal. (R. 205).  She was able to get on and off the examining table, without assistance; she walked slowly with a limp to the left; she was unable to walk on the toes or on the heels to squat; she was unable to walk heel-to-toes; she was unable to hop; she was able to ben over the get back up; and, there were no signs of ataxia. (R. 205).  Dr. Nahas further reported that a lumbrosacral spine radiograph showed degenerative changes with osteophyte formation at the L2-L3 levels, along with narrowing of disc interspace at the L5-S1 level. (R. 207).  Dr. Nahas' impression of Smart was spondylosis, with chronic cervical and lower back; osteoarthritis, with recurrent pain of the hands and knees; hypertension, uncontrolled; and moderate obesity. (R. 207).

On December 5, 2000, Smart underwent a consultative psychiatric evaluation with John T. Harris, M.D. ("Dr. Harris"). (R. 199-203).  In his evaluation, Dr. Harris observed that Smart was moderately disheveled with dirty, stained clothes and a mildly perceptible odor. (R. 200).  Smart

16

maintained good eye contact, and her speech was of normal rate, volume, and clarity. (R. 200). Dr. Harris observed no obvious distress. (R. 200). Smart's attitude was cooperative; her behavior was appropriate; and her psychomotor activity was moderately low. (R. 200). Dr. Harris noted that Smart's mood was moderately depressed, and affect range and intensity were moderately low. (R. 200). Smart was alert and oriented to person, place, time, situation, exact day of week, and exact date. (R. 201). Smart correctly demonstrated intact abstract thought. (R. 201). Dr. Harris further reported that Smart's insight and judgment were both fully intact based on the content of the interview and mental status exam; he further noted that Smart's intellectual functioning was average based on vocabulary used, mental status exam, content of interview, and general past history. (R. 201). Dr. Harris reported under "activities of daily living" the following:

> The patient is able to bathe herself, groom herself, cook for herself, clean for herself, shop for herself, maintain her own finances and maintain her own transportation needs with her own car and her own driver's license. The patient drove to the interview today with her own car and her own driver's license. She drove herself to the interview alone without assistance. The patient is independent in performing all activities of daily living.

(R. 201). Dr. Harris found that Smart had poor social skills and a poor social support network. (R. 202). He further determined that she was moderately impaired in concentration, persistence, and pace. Based on his evaluation, Dr. Harris diagnosed Smart with moderate dysthymia, evaluating her

17

with a global assessment of functioning (" GAF") of 50 with 55 being the highest score in the last year.[2] (R. 202).

In January 2001, state agency disability examiners determined Smart's symptoms of low back pain and affective/mood disorders were not severe enough to be considered disabling. (R. 177-198). As to her alleged limitations due to problems with her back, neck, shoulder, and hand, it was noted that Smart had tenderness in the cervical region of her lower back. (R. 192). Smart, however, had no evidence of inflammation, effusion/swelling in any joints (R. 192). Also, she had 4/5 muscle strength in her left lower extremity and 5/5 in other muscle groups. (R. 192-193). There was no evidence of muscle wasting or atrophy. (R. 193). Smart had the ability to handle small objects with fine finger movements; she was able to get on and off the examination table without assistance; and she was able to bend over and get back up with no signs of ataxia. (R. 193). X-rays indicated a narrowing of disc interspace at L5-S1, but there was no spondylolisthesis. (R. 193). Hence, the examiner found that Smart's alleged limitations were not fully supported. (R. 196). With regard to her depression, it was noted that Smart has no history of psychiatric hospitalizations and that she was not taking psychotropic medication at that time. (R. 189). Smart was observed to be oriented; she accurately performed requested testing; and she had the ability to perform activities of daily living,

---

[2] A GAF score represents a clinician's judgment of an individual's overall level of functioning. *See* AMERICAN PSYCHIATRIC ASSOCIATION: DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS ("DSM-IV-TR") 32 (4th ed. 2000). The reporting of overall functioning is done by using the GAF Scale, which is divided into ten ranges of functioning—*e.g.*, 90 (absent or minimal symptoms) to 1 (persistent danger of severely hurting self or others, or unable to care for himself). The GAF rating is within a particular decile if either the symptom severity or the level of functioning falls within the range. Lower GAF scores signify more serious symptoms. A GAF rating of 50 indicates a " serious" impairment in social, occupational, or school functioning (*e.g.*, no friends, unable to keep a job); whereas, a GAF rating of 55 indicates a "moderate" impairment in social, occupational, or school functioning (*e.g.*, few friends, conflicts with peers or coworkers). *See id* at 34.

grocery shop, cook, clean, drive, and maintain finances.  (R. 189).  Although poor social skills and

a tendency to self isolate were noted, her insight and judgment were reported to be intact.  (R. 189).

Thus, her alleged mental limitation was found not to be fully supported.  (R. 189).  The state agency

decisions were reviewed and affirmed on March 13, 2001.  (R. 25, 75-76).

On July 7, 2001, Smart visited chiropractor William M. Colgin, D.C., reportedly for pain in

her right shoulder, back, and neck from injuries sustained from tripping over a soda can while

shopping in a store on June 26, 2001.  (R. 276-279).  X-rays taken of the lumbar spine, cervical

spine, and right shoulder were normal.  (R. 278).  Smart was diagnosed with cervical, thoracic and

lumbar IVD sync c/o myelopathy and right shoulder sprain.  (R. 279).  She was placed on a regimen

of conservative orthopedic management and physical modalities.  (R. 279).  Smart was referred to

orthopaedic surgeon Jeffrey Reuben, M.D. ("Dr. Reuben").  (R. 274-275).  On July 17, 2001, Smart

visited Dr. Reuben, who reported that her motor strength, sensation and reflexes were normal in both

upper and lower extremities, with moderate restriction in flexion, extension and rotation of the

thoracic and lumbar spine.  (R. 274-275).  He noted moderate restriction in internal rotation of the

right shoulder.  (R. 275).  Dr. Reuben's assessment was that Smart had "right shoulder impingement

and discogenic "cervicothoracic" and lumbar pain following vehicular trauma."  (R. 275).  Dr.

Reuben recommended that Smart rest, apply hot/cold compresses, and undergo a course of physical

therapy.  (R. 275).

On August 10, 2001, Dr. Reuben saw Smart for a follow-up visit.  (R. 272-273).  Dr. Reuben

noted that Smart's shoulder pain had not improved with physical therapy and she wished to undergo

right shoulder arthroscopy.  (R. 272-273).  On August 29, 2001, Smart had surgery on her right

shoulder.  (R. 271).

On October 24, 2001, Dr. Reuben noted that Smart had a "good result following right shoulder arthroscopy" and that she was "happy with her result." (R. 271).   Dr. Reuben reported her shoulder range of motion to be 80%, and he recommended that she work on stretching and range of motion exercises in therapy and that she have an MRI taken of her cervical spine.  (R. 271).

On December 14, 2001, Smart returned to see Dr. Reuben for a follow-up visit.  (R. 270).  Dr. Reuben noted that Smart had underwent a cervical and right shoulder MRI.  (R. 270).  Although the MRI does not appear as part of the medical records, Dr. Reuben reported that the MRI of her right shoulder revealed that she had fluid in the subacromial space and no rotator cuff tear.  (R. 270).  It further showed multi-level cervical disc protrusions and/or herniation.  (R. 270).

On January 11, 2002, Smart met with Dr. Reuben again, complaining of neck pain.  (R. 269).  According to Dr. Reuben, Smart was a candidate for cervical ESI because she had not improved with extensive conservative treatment.  (R. 269).

In May 2002, Smart visited Robert J. Kilian, M.D. ("Dr. Kilian"), complaining of pain in her right shoulder and neck.  (R. 311-312).   Smart received an injection in her shoulder and was prescribed a muscle relaxer, which reportedly helped decrease muscle spasms.  (R. 311).

On June 27, 2002, Smart testified at the administrative hearing in this case as follows:

> She stated that she has depression but that due to lack of funds she has not seen a
> treating doctor for at least two years.  She had been told my MWMR (sic) to seek
> treatment.  She alleges that she has a herniated disc.  She stated that she is 48 years
> old and that she had graduated from high school.  She has prior work experience as
> a payroll manager, a billing clerk, an assistant manager, [and] she know computers.
> Currently she has seen a doctor that has tank an MRI as she fell at a store in June and
> the doctor feels that the injury will be diagnosed with the assistance of an MRI.  She
> suffers from constant pain on her neck and shoulders.  She has arthritis.  She alleges
> that if she performs and work activity the pain increases in severity.  She resides in
> Wharton, Texas.  She had driven to the hearing site and that it had taken two hours.
> She explained that she depends on her husband to perform most of the housework.

20

She has two grown daughters.  She explained that since the accident her weight increased from 180 pounds to her current weight of 240 pounds. She estimated that at the most she is able to walk about 30 minutes and stand only for about 15 minutes. There are times when she goes to the Wal-Mart store with her daughters.  Her daughter also help her husband perform the household chores.  She was complaining at the hearing that her right side was hurting.  In the morning after she gets up she perform[s] all of her hygiene needs except that she depends on her husband to comb her hair.  She stated that when she worked[,] the work required that she travel but she would not be able to do that now.  She alleges that she also has problems with hypertension and osteoporosis and with her stomach.  She explained that the medication makes her very drowsy and she becomes very sleepy and must take naps. She explained  that when the driver's license renewal comes up that she will no longer be in a health position that will allow her to renew her license.

(R. 24, 33-53).

On December 15, 2003, Smart presented to Anthony James Longo, M.D. ("Dr. Longo"), complaining of right shoulder pain, left knee pain, and cervical spine pain.  (R. 319-320).  Dr. Longo noted that Smart had undergone EMG studies as well as an MRI of her cervical spine on October 8, 2003.  (R. 319).  Although the MRI is not part of the medical record, according to Dr. Longo, the testing revealed a herniated nucleus pulposus ("HNP") of C-5/6, mild carpal tunnel syndrome, and mild left knee degenerative joint disease.  (R. 319).  Smart was referred to the ortho-spine clinic to address her HNP.  (R. 319).  She was placed on medication for her knee pain and advised to wear night splints for her carpal tunnel.  (R. 319).

" [O]rdinarily the opinions, diagnoses, and medical evidence of a treating physician who is familiar with the claimant' s injuries, treatments, and responses should be accorded considerable weight in determining disability." *Greenspan*, 38 F.3d at 237; *accord Myers*, 238 F.3d at 621; *Loza*, 219 F.3d at 395; *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985).  The opinion of a specialist generally is accorded greater weight *than* that of a non-specialist.  *See Newton*, 209 F.3d at 455; *Paul v. Shalala*, 29 F.3d 208, 211 (5th Cir. 1994), *overruled on other grounds by Sims*

*v. Apfel*, 530 U.S. 103, 108 (2000).  Medical opinions are given deference, however, only if those opinions are shown to be more than conclusory and supported by clinical and laboratory findings. *See Scott*, 770 F.2d at 485.  Moreover, a treating physician's opinions are far from conclusive and may be assigned little or no weight when good cause is shown.  *See Myers*, 238 F.3d at 621; *Loza*, 219 F.3d at 395; *Greenspan*, 38 F.3d at 237.  Good cause may permit an ALJ to discount the weight of a treating physician's opinion in favor of other experts when the treating physician's evidence is conclusory, unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence.  *See Myers*, 238 F.3d at 621; *Newton*, 209 F.3d at 456; *see also Brown*, 192 F.3d at 500; *Greenspan*, 38 F.3d at 237; *Paul*, 29 F.3d at 211.  It is well settled that even though the opinion and diagnosis of a treating physician should be afforded considerable weight in determining disability, the ALJ has sole responsibility for determining a claimant's disability status.  *See Paul*, 29 F.3d at 211; *accord Myers*, 238 F.3d at 621; *Newton*, 209 F.3d at 455.

In the present case, based on the objective medical facts and opinions of physicians, there is substantial evidence in the record to support the ALJ's determination that Smart suffered from impairments which did not meet or equal the requirements of a listing.  Smart's contention that the ALJ should have give controlling weight to Dr. Khurshid's medical source statement of November 30, 1999, is misplaced.  As a threshold matter, Dr. Khurshid's statement was completed seven months outside the relevant time period (*i.e.*, the ALJ decision dated June 29, 2000).  Additionally, no clinical findings support the limits set forth by Dr. Khurshid in his statement.  To the contrary, on August 30, 1999, he noted that Smart's extremities were without cyanosis, clubbing, or edema, and that her coordination and gait were normal.  (R. 253).  Dr. Khurshid's assessment was that Smart had a

"[m]ildly abnormal neurological examination suggestive of radiculopathy." (R. 253). On September 22, 1999, Dr. Peitersen, a neurological surgeon found no evidence of any significant cervical radiculopathy or myelopathy. (R. 243, 245).  On September 30, 1999, Dr. Khurshid reviewed Dr. Peitersen's conclusions and, upon examination of Smart, noted that Smart had normal strength bilaterally and that her coordination and gait examinations showed no trunkal ataxia. (R. 248). Taking into consideration the above clinical findings as well as the fact that it was outside the relevant period, Dr. Khurshid's restrictive, unexplained medical source statement of November 1999, which limited Smart to lifting only two pounds, is not supported by the record and not entitled to controlling weight.

Furthermore, a year later in November 2000, during the relevant period, Dr. Nahas observed that Smart had no muscle wasting, atrophy, or fasciculation, that deep tendon reflexes were normal and equal bilaterally, that she had no edema, cyanosis, or clubbing, and that peripheral pulses were present. (R. 205).  Dr. Nahas reported tenderness in the cervical region and the lower back, that there was no inflammation, effusion, or swelling in any joints, and that there was only mild guarding of the bilateral trapezius muscles. (R. 205).  Although Smart walked slowly with a limp to the left and could not squat or walk heel-to-toes, she was able to get on and off the examining table without assistance and to ben over and get back up, without signs of ataxia. (R. 205).  Thus, from Dr. Nahas' report, Smart did not appear to be as restricted as indicated by Dr. Khurshid.  Finally, Dr. Nahas placed no functional limitations on Smart's ability to work.

With respect to Dr. Reuben's report, it appears that the ALJ incorporated the limitations, which were caused by conditions that Dr. Rueben reported, such as his report on Smart's MRI in January 2002, of disc herniation and protrusion.  (R. 269).  Dr. Reuben did not appear to place any

23

functional limitations on what Smart could do, aside from stating Smart should rest when Smart first saw him in August 2001.  (R. 275).  Thus, by setting forth a limited sedentary residual functional capacity, the ALJ compensated for Smart's impairments that Dr. Reuben noted.

As to Smart's mental condition, in a consultative examination, Dr. Harris diagnosed Smart with moderate dysthymia and assigned a GAF score of 50.  (R. 202).  Although a GAF score of 50 indicates serious symptoms, Dr. Harris noted that during the examination Smart was alert, oriented to person, place, time, and situation, that she had no loosening of associations, and her insight and judgment were fully intact. (R. 201).  Dr. Harris also reported that Smart said she was able to drive, cook, clean, shop, and maintain her own finances.  (R. 201).  Because Dr. Harris' GAF score of 50 appeared inconsistent with Smart's activities of daily living and his assessment of "moderate dysthymia," the ALJ properly relied on the medical expert's assessment that the medical evidence did not substantiate that Smart's mental disorder was severe.  *See generally Costancio v. Apfel*, 240 F.3d 1074, 2000 WL 1835314, at *1 (5th Cir. Dec. 1, 2000).  In any event, Dr. Harris did not indicate that Smart's GAF score impaired her ability to work.  "[T]he score, standing alone, without further explanation, does not establish an impairment severely interfering with an ability to perform basic work activities." *Eden v. Barnhart*, 109 Fed. Appx. 311, 314 (10th Cir. 2004); *see also Camp v. Barnhart*, 103 Fed. Appx. 352, 354 (10th Cir. 2004).

Moreover, Smart conceded at the administrative hearing that she had not been treated for depression since 2000,[3] but claimed she could not afford such treatment.  (R. 33-34).  Smart has presented no evidence that she tried to seek, but was denied, indigent health care during this time frame.  *See Harris v. Barnhart*, 356 F.3d 926, 930 (8th Cir. 2004) (in evaluating the credibility of subjective complaints, it was permissible for the ALJ to consider the lack of evidence that complainant had sought stronger pain treatment available to indigents); *Riggins v. Apfel*, 177 F.3d 689, 693 (8th Cir. 1999) (claimant must demonstrate that he attempted to receive indigent health care); *Murphy v. Sullivan*, 953 F.2d 383, 386-87 (8th Cir. 1992) (it is inconsistent with the degree of pain and disability asserted where no evidence exists that claimant attempted to find any low cost or no cost medical treatment for alleged pain and disability).  The fact that Smart could perform activities of daily living and had not had any on-going treatment was properly considered by the ALJ in finding that Smart's mental condition did not functionally affect her.

### 2.    *Subjective Complaints*

The law requires the ALJ to make affirmative findings regarding a claimant's subjective complaints.  *See Falco v. Shalala*, 27 F.3d 160, 163 (5th Cir. 1994) (citing *Scharlow v. Schweiker*, 655 F.2d 645, 648-49 (5th Cir. 1981)).  When a plaintiff alleges disability resulting from pain, she must establish a medically determinable impairment that is capable of producing disabling pain.  *See Ripley*, 67 F.3d at 556 (citing 20 C.F.R. § 404.1529).  Once a medical impairment is

---

[3]  In May 2000, Dr. Kaza's records indicated that Smart's medications were helping her with symptoms of depression. (R. 216). Although Smart had not seen a psychiatrist in two years, Smart testified that she was taking prescription medication for depression that she received from her husband's family doctor. (R. 50).  Medical impairments that reasonably can be remedied or controlled by medication or treatment are not disabling."  *Glenn v. Barnhart*, 124 Fed. Appx. 828, 829 (5th Cir. 2005) (citing *Johnson v. Bowen*, 864 F.2d 340, 347 (5th Cir. 1988); *Fraga v. Bowen*, 810 F.2d 1296, 1303-04 (5th Cir. 1987); *Adams v. Bowen*, 833 F.2d 509, 511-12 (5th Cir. 1987)).

established, the subjective complaints of pain must be considered along with the medical evidence in determining the individual's work capacity. *See id.* It is well settled that an ALJ's credibility findings on a claimant's subjective complaints are entitled to deference. *See Chambliss v. Massanari*, 269 F.3d 520, 522 (5th Cir. 2001); *Scott v. Shalala*, 30 F.3d 33, 35 n.2 (5th Cir. 1994); *Falco*, 27 F.3d at 164; *Wren*, 925 F.2d at 128. The Fifth Circuit recognizes that "the ALJ is best positioned" to make these determinations because of the opportunity to observe the claimant first-hand. *See Falco*, 27 F.3d at 164 n.18. Moreover, "[t]he Act, regulations and case law mandate that the Secretary require that subjective complaints be corroborated, at least in part, by objective medical findings." *Harrell v. Bowen*, 862 F.2d 471, 481 (5th Cir. 1988) (citing 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 404.1529; *Owens v. Heckler*, 770 F.2d 1276, 1281-82 (5th Cir. 1985)); *accord Chambliss*, 269 F.3d at 522 (citing *Houston v. Sullivan*, 895 F.2d 1012, 1016 (5th Cir. 1989)); *Hampton v. Bowen*, 785 F.2d 1308, 1309 (5th Cir. 1986).

As a matter of law, the mere fact that working may cause a claimant pain or discomfort does not mandate a finding of disability. *See Hames*, 707 F.2d at 166; *Epps v. Harris*, 624 F.2d 1267, 1274 (5th Cir. 1980); *accord Brown v. Bowen*, 794 F.2d 703, 707 (D.C. Cir. 1986). Additionally, the mere existence of pain does not automatically bring a finding of disability. *Harper v. Sullivan*, 887 F.2d 92, 96 (5th Cir. 1989); *Owens*, 770 F.2d at 1281. It must be determined whether substantial evidence indicates an applicant can work despite being in pain or discomfort. *See Chambliss*, 269 F.3d at 522; *Johnson v. Heckler*, 767 F.2d 180, 182 (5th Cir. 1985).

For pain to rise to the level of disabling, that pain must be "constant, unremitting, and wholly unresponsive to therapeutic treatment." *Chambliss*, 269 F.3d at 522; *Falco*, 27 F.3d at 163; *Wren*, 925 F.2d at 128. The decision arising from the ALJ's discretion to determine whether

26

pain is disabling is entitled to considerable deference.  *See Chambliss*, 269 F.3d at 522; *Wren*, 925

F.2d at 128; *James*, 793 F.2d at 706.   However, an ALJ may discount subjective complaints of

pain as inconsistent with other evidence in the record.  *See Dunbar v. Barnhart*, 330 F.3d 670, 672

(5th Cir. 2003) (citing *Wren*, 925 F.2d at 128 (citation omitted)).

At the administrative hearing, Smart testified regarding her complaints of pain.  (R. 37-38,

44-45, 47).   The ALJ's decision indicates that the ALJ did consider objective and subjective

indicators related to the severity of Smart's pain:

> In making this assessment, the undersigned considered all symptoms, including pain,
> and the extent to which these symptoms can reasonably be accepted as consistent with
> the objective medical evidence and other evidence based on the requirements of 20
> C.F.R. § 404.1529 and Social Security Ruling 96-7p.

* * *

> Based on review of all evidence, the undersigned finds that the claimant's testimony
> of pain and extreme activity limitations are not fully credible (SSR 96-7p).  The
> objective record does not support the claimant's allegations that she is disabled.

(R. 26).  The ALJ's findings are supported by the medical records.  Indeed, as noted by Dr. Nahas

in November 2000, there was no evidence of muscle wasting, atrophy, or fasciculation.  (R. 205).

Smart had normal grip strength, normal fine finger movements, and was able to get on and off the

examination table, without assistance.  (R. 205). In December 2000, Dr. Harris reported that Smart

could perform activities of daily living, including bathing herself, grooming, cooking, cleaning,

shopping, driving, and maintaining her own finances.  (R. 201).   In January 2001, state agency

examiners saw no evidence of inflammation, effusion/swelling in any joints.  (R. 192).  Also, she had

normal muscle strength, with no evidence of muscle wasting or atrophy.  (R. 193).  Additionally, x-

rays revealed no spondylolisthesis.  (R. 193).  In July 2001, Dr. Reuben observed that her motor

strength, sensation and reflexes were normal in both upper and lower extremities, with moderate restriction in flexion, extension and rotation of the thoracic and lumbar spine.  (R. 274-275).  After Smart underwent right shoulder arthroscopy in August 2001, Dr. Reuben reported her range of motion to be 80% and that she was "happy with her result."  (R. 271).  Although Dr. Reuben noted in December 2001 that Smart had a herniated disc, he only indicated in a letter to Smart's chiropractor that Smart should "work on anterior capsule stretching and range of motion exercises in therapy." (R. 270).  He did not set forth any functional limitations.  (R. 270).  Additionally, in December 2003, Dr. Longo assessed her with mild carpal tunnel syndrome, mild degenerative joint disease in her left knee, and a herniated disc at C-5/6.  (R. 319).  He did set forth any functional limitations.  (R. 319).

Because the objective evidence failed to substantiate the amount of pain and/or limitations alleged by Smart, the ALJ correctly discounted Smart' s credibility.  (R. 24, 56-57).  Also undermining Smart's credibility was the results of a February 2000 functional capacity examination, which revealed that Smart exhibited inappropriate responses in 7 of 14 tests, indicating inconsistent effort.  (R. 228, 234).  Moreover, although Smart testified at the administrative hearing that her medication made her drowsy and required her to take naps, there was sufficient legal reason to reject complaints of disabling side effects of medication because there is no evidence in the record that Smart complained about these effects to her treating physician.  *See Hajek v. Shalala*, 30 F. 3d 89, 92 (8th Cir. 1994).  Smart' s testimony, without more, is insufficient to establish that medication side effects constituted a significant work-related limitation.  *See Wren*, 925 F. 2d at 125; *Houston*, 895 F. 2d at 1016 (subjective complaints must be corroborated at least in part by objective medical evidence).

The Court does not doubt that Smart suffers from pain; however, the records do not support a finding that Smart's pain is constant, unremitting, and wholly unresponsive to therapeutic treatment. *See Chambliss*, 269 F.3d at 522; *Falco*, 27 F.3d at 163; *Wren*, 925 F.2d at 128. Accordingly, there is substantial evidence that supports the ALJ's finding that Smart's subjective reports of pain do not rise to the level of disability.

### 3.   *Residual Functional Capacity*

Under the Act, a person is considered disabled:

> . . . only if h[er] physical or mental impairment or impairments are of such severity that [s]he is not only unable to do h[er] previous work but cannot, considering h[er] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [s]he lives, or whether a specific job vacancy exists for h[er], or whether [s]he would be hired if [s]he applied for work. . . .

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).   The Commissioner bears the burden of proving that a claimant's functional capacity, age, education, and work experience allow her to perform work in the national economy. *See Brown v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *see also Masterson*, 309 F.3d at 272; *Watson*, 288 F.3d at 216; *Myers*, 238 F.3d at 619; *Greenspan*, 38 F.3d at 236. If the Commissioner fulfills this burden by pointing out potential alternative employment, the claimant, in order to prevail, must prove that she cannot perform the alternate work suggested. *See Masterson*, 309 F.3d at 272; *Boyd*, 239 F.3d at 705; *Shave*, 238 F.3d at 594; *Carey v. Apfel*, 230 F.3d 131, 135 (5th Cir. 2000).

To determine whether a claimant can return to a former job, the claimant's "residual functional capacity" must be assessed. *See Moore v. Sullivan*, 895 F.2d 1065, 1068 (5th Cir. 1990); *see also* 20 C.F.R. § 404.1545.   This term of art merely represents an individual's ability

29

to perform activities despite the limitations imposed by an impairment. *See Villa v. Sullivan*, 895 F.2d 1019, 1023 (5th Cir. 1990); *see also* 20 C.F.R. § 404.1545. Residual functional capacity combines a medical assessment with the descriptions by physicians, the claimant or others of any limitations on the claimant's ability to work. *See Elzy v. Railroad Retirement Bd.*, 782 F.2d 1223, 1225 (5th Cir. 1986); *see also* 20 C.F.R. § 404.1545. When a claimant's residual functional capacity is not sufficient to permit her to continue her former work, then her age, education, and work experience must be considered in evaluating whether she is capable of performing any other work. *See Boyd*, 239 F.3d at 705; 20 C.F.R. § 404.1520. The testimony of a vocational expert is valuable in this regard, as "she is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed." *Fields v. Bowen*, 805 F.2d 1168, 1170 (5th Cir. 1986); *accord Carey*, 230 F.3d at 145; *see also Vaughan v. Shalala*, 58 F.3d 129, 132 (5th Cir. 1995).

In evaluating a claimant's residual functional capacity, the Fifth Circuit has looked to SSA rulings ("SSR"). *See Myers*, 238 F.3d at 620. The Social Security Administration's rulings are not binding on this court, but they may be consulted when the statute at issue provides little guidance. *See id.* In *Myers*, the Fifth Circuit relied on SSRs addressing residual functional capacity and exertional capacity. *See id.* In that case, the court explained:

> First, SSR 96-8p provides that a residual functional capacity (RFC) is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A regular and continuing basis means 8 hours a day, for 5 days a week, or an equivalent work schedule. The RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities. However, without the initial function-by-function assessment of the individual's physical and mental capacities, it may not be possible to determine whether the individual is able to do past relevant work. . . . RFC involves both exertional and non-exertional factors.

30

> Exertional capacity involves seven strength demands:  sitting, standing, walking, lifting, carrying, pushing, and pulling.  Each function must be considered separately.  In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis. . . .  The RFC assessment must include a resolution of any inconsistencies in the evidence.

*Id.* (internal citations omitted); *see* 61 Fed. Reg. 34474-01 (July 2, 1996).  The court further commented:

> Second, SSR 96-9p also provides that initially, the RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to perform work-related activities. . . .  The impact of an RFC for less than a full range of sedentary work is especially critical for individuals who have not yet attained age 50.  Since age, education, and work experience are not usually significant factors in limiting the ability of individuals under age 50 to make an adjustment to other work, the conclusion whether such individuals who are limited to less than the full range of sedentary work are disabled will depend primarily on the nature and extent of their functional limitations or restrictions.

*Id.* (internal citations omitted); *see* 61 Fed. Reg. 34478 (July 2, 1996).  The court also noted that SSR 96-9p defines "exertional capacity" as the aforementioned seven strength demands and requires that the individual's capacity to do them on a regular continuing basis be stated.  *See id.* To determine that an claimant can do a given type of work, the ALJ must find that the claimant can meet the job's exertional requirements on a sustained basis.  *See Carter v. Heckler*, 712 F.2d 137, 142 (5th Cir. 1983) (citing *Dubose v. Matthews*, 545 F.2d 975, 977-78 (5th Cir. 1977)).

### a.    *Hypothetical to the Vocational Expert*

In the case at bar, Smart argues that the ALJ erred in not presenting all of Smart's limitations to the vocational expert in the form of a hypothetical question.  As an initial matter, when an ALJ concludes at step four of the sequential evaluation process that a person can perform her past relevant work, a vocational expert is not required.  *See Williams v. Califano*, 590 F.2d 1332, 1334 (5th Cir.

31

1979).  Furthermore, as set forth above, Smart's RFC included limitations for all of the conditions that functionally affected Smart.

Notwithstanding, a hypothetical question with these limitations was presented to the vocational expert, who stated, that despite these limitations, Smart could perform her past relevant work as a payroll manager, an accounts receivable clerk, and as a billing specialist.  (R. 26-27, 69). Moreover, Smart's counsel was provided an opportunity at the administrative hearing to question the vocational expert regarding additional limitations.  *See Boyd*, 239 F. 3d at 707; *see also Bowling v. Shalala*, 36 F. 3d 431, 436 (5th Cir. 1994) (when a hypothetical question reasonably incorporates all of the "disabilities" found by the ALJ, and claimant's representative was provided an opportunity to "correct any defect" about additional limitations, the hypothetical question is sufficient).  Hence, the ALJ's decision at step four of the sequential evaluation process was proper.

### b.       *Develop the Record*

Finally, Smart argues that the ALJ failed to develop the record**.**  It is uncontroverted that an ALJ is under an obligation to fairly and fully develop the record in a claim for benefits.  *See Carrier v. Sullivan*, 944 F. 2d 243, 245 (5th Cir. 1991).  In order to obtain a reversal for an ALJ' s failure to fully develop the record, however, a plaintiff must demonstrate prejudice in that had the ALJ done his duty, he could and would have adduced evidence that might have altered the result.  *See Guitierrez v. Barnhart*, No. 04-11025, 2005 WL 1994289, at *8 (5th Cir. Aug. 19, 2005).  Here, Smart has failed to show either criteria.  Indeed, the ALJ ordered two consultative examinations to aid him in assessing Smart' s condition.  (R. 199, 204).  Smart fails to identify any additional favorable evidence that neither she nor her counsel were able to produce that would have aided the ALJ in his assessment.  " When an applicant for social security benefits is

32

represented by counsel[,] the [ALJ] is entitled to assume that the applicant is making h[er] strongest case for benefits." *Glenn v. Secretary of Health & Human Servs.*, 814 F.2d 387, 391 (7th Cir. 1987).   Contrary to Smart's contention, the ALJ complied with his duty he had to develop the record and there was substantial evidence from which the ALJ could render a decision.

### III.   *Conclusion*

In sum, the record provides substantial evidence supporting the Commissioner's decision that Smart is not disabled.  It is, therefore

**ORDERED** that Smart's Motion for Summary Judgment (Docket Entry No. 13) is **DENIED**.  It is further

**ORDERED** that Commissioner's Motion for Summary Judgment (Docket Entry No. 14) is **GRANTED**.  It is further

**ORDERED** that the Commissioner's decision is **AFFIRMED**.  Finally, it is

**ORDERED** that this matter is **DISMISSED** from the dockets of this Court.

**SIGNED** at Houston, Texas, on this the 21st day of October, 2005.

Calvin Botley
United States Magistrate Judge

33